[Cite as *State v. Stover*, 2013-Ohio-5665.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
UNION COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,               CASE NO.  14-12-24

      v.

TORY D. STOVER,                      **O P I N I O N**

      DEFENDANT-APPELLANT.

Appeal from Union County Common Pleas Court
Trial Court No. 11 CR 0034

Judgment Affirmed

Date of Decision:  December 23, 2013

APPEARANCES:

     *Samuel H. Shamansky* **for Appellant**

     *David W. Phillips and Melissa A. Chase*  **for Appellee**

Case No. 14-12-24

**SHAW, J.**

{¶1} Defendant-appellant Tory D. Stover ("Stover") appeals the August 27, 2012, judgment of the Union County Common Pleas Court sentencing Stover to three years in prison following Stover's jury trial conviction for Felonious Assault in violation of R.C. 2903.11(A)(1), a felony of the second degree.

{¶2} The facts relevant to this appeal are as follows. On February 28, 2011, Stover was indicted for one count of Felonious Assault in violation of R.C. 2903.11(A)(1), a felony of the second degree. (Doc. 1). The indictment stemmed from an incident occurring on January 22-23, 2011, wherein Stover was among a group of people who repeatedly kicked Jonathan Kelley ("Kelley") while Kelley was already on the ground on the losing end of a fight with Nick Sparks.[1]

{¶3} On March 4, 2011, Stover was arraigned and pled not guilty to the charge against him. (Doc. 6); (Doc. 9).

{¶4} A jury trial was held on October 24-27, 2011. At the trial, the State called 13 witnesses, which included the victim, Kelley, and four individuals who were at the scene of the incident and witnessed Stover repeatedly kick Kelley while Kelley was on the ground. One of these witnesses testified that Stover kicked Kelley "at least" 20 times. (Tr. Vol. II at 126).

---

[1] The transcripts list the spelling of Kelley's last name as "Kelly." The appellant refers to him this way as well. The State and the indictment spell his name "Kelley." As the indictment lists his name as "Kelley" we will use this spelling going forward.

-2-

{¶5} Among the other witnesses called by the State at trial were the officers who investigated the incident, and the doctors who treated Kelley in the emergency room and on Kelley's follow-up visits. Photographs depicting the extent of Kelley's injuries on the date of the incident and fifteen days later were also introduced into evidence.

{¶6} At the conclusion of the State's case, Stover made a Crim.R. 29 motion for acquittal, arguing, *inter alia*, that the State failed to prove the element of "serious physical harm." This motion was overruled by the trial court.

{¶7} Stover then presented his case-in-chief, calling a doctor to the stand who had reviewed the medical records and opined that Kelley's injuries did not meet the definition of "serious physical harm." The defense then rested its case and the parties proceeded to closing arguments.

{¶8} Following the parties' closing arguments, the trial court gave jury instructions. The jury was instructed on Felonious Assault and the lesser-included offense of Assault. Ultimately, the jury found Stover guilty of Felonious Assault as charged in the indictment. Subsequently the trial court ordered a pre-sentence investigation and set the matter for a sentencing hearing.

{¶9} On January 9, 2012, a sentencing hearing was held. (Doc. 125). Stover was ordered to serve three years in prison. (*Id.*) A final judgment entry reflecting this was filed August 27, 2012. (*Id.*)

{¶10} It is from this judgment that Stover appeals, asserting the following assignments of error for our review.

**ASSIGNMENT OF ERROR 1**
**APPELLANT WAS CONVICTED IN THE ABSENCE OF EVIDENCE SUFFICIENT TO SUPPORT A FINDING OF GUILTY IN VIOLATION OF HIS RIGHT TO DUE PROCESS AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

**ASSIGNMENT OF ERROR 2**
**APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF HIS RIGHT TO DUE PROCESS AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

{¶11} As the discussion of the issues in the assignments of error is somewhat interrelated, we elect to address the assignments of error together.

*First and Second Assignments of Error*

{¶12} In Stover's first assignment of error he argues that there was insufficient evidence to convict him. Specifically, Stover contends that that Kelley did not suffer "serious physical harm." In Stover's second assignment of error, he argues that his conviction was against the manifest weight of the evidence. Specifically, Stover argues that even if there was sufficient evidence to find Kelley suffered "serious physical harm," the jury's finding was against the manifest weight of the evidence. In addition, Stover contends that the testimony of the State's witnesses was inconsistent.

{¶13} When an appellate court reviews a record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Monroe,* 105 Ohio St.3d 384, 2005–Ohio–2282, ¶ 47, citing *State v. Jenks,* 61 Ohio St.3d 259 (1991), superseded by state constitutional amendment on other grounds as stated in *State v. Smith,* 80 Ohio St.3d 89 (1997). Sufficiency is a test of adequacy, and the question of whether evidence is sufficient to sustain a verdict is one of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997).

{¶14} The Ohio Supreme Court has "carefully distinguished the terms 'sufficiency' and 'weight' in criminal cases, declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.'" *Eastley v. Volkman,* 132 Ohio St.3d 328, 2012–Ohio–2179, ¶ 10, quoting *State v. Thompkins,* 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

{¶15} Unlike our review of the sufficiency of the evidence, an appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *Volkman, supra,* at ¶ 12; *Thompkins*, *supra*, at 387. In reviewing whether the trial court's judgment was against the weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *Thompkins* at 387. In

doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Andrews,* 3d Dist. No. 1–05–70, 2006–Ohio–3764, ¶ 30, quoting *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶16} In this case, Stover was charged with Felonious Assault in violation of R.C. 2903.11(A)(1), which reads, "No person shall knowingly * * * [c]ause serious physical harm to another[.]" Serious physical harm is defined in R.C. 2901.01(A). It reads,

> **(5) "Serious physical harm to persons" means any of the following:**
>
> **(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;**
>
> **(b) Any physical harm that carries a substantial risk of death;**
>
> **(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;**
>
> **(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;**

**(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.**

{¶17} At trial, evidence was presented that on the evening of January 22, 2011, Kelley went over to Michael Gayle's residence to hang out. (Tr. Vol. II at 14). Also present at Gayle's residence along with Kelley and Gayle were Luke Parish, Ashley Wintersteller, and Taylor Watkins. (*Id*.); (Tr. Vol. II at 198). While at Gayle's residence, Kelley consumed some beer.[2] (Tr. Vol. II at 15).

{¶18} During the course of the evening, Kelley got a phone call from his step-brother, Joe Neil.[3] (Tr. Vol. II at 49); (Tr. Vol. II at 20). Neil told Kelley about an incident that happened on a prior night wherein Nick Sparks, Stover, and others allegedly went to Neil's home and "started hitting one of [Neil's] friends." (Tr. Vol. II at 51). Following this phone call, Kelley called Nick Sparks to confront him about this alleged incident. (*Id*. at 16). Sparks was at the Brofford residence at the time of the call along with others who were drinking and playing "beer pong."[4] (*Id*. at 165-67). Sparks told Kelley that if Kelley "wanted to handle things, just come out." (*Id*. at 17).

{¶19} Following the phone conversation with Sparks, Kelley testified that he left Gayle's residence along with Gayle and Luke parish to drive to the

---

[2] Kelley was seventeen years old at the time of this incident.
[3] The transcript spells Joe's last name "Neil," yet spells the last name of Kelley's mother as "Neal." It is unclear which is the proper spelling.
[4] Sparks, Stover, and Devon Kiss, who was also present at the Brofford residence, were all under 21 as well.

Brofford residence. (*Id*. at 19). All three testified that it was not Kelley's intention to fight, but rather to confront Sparks. (*Id*.); (*Id*. at 151); (Tr. Vol. III at 59). Ashley Wintersteller and Taylor Watkins also drove to the Brofford residence in a separate vehicle. (Tr. Vol. II at 201).

{¶20} When Kelley arrived at the Brofford residence, he pulled down the Brofford's long driveway. (Tr. Vol. II at 20). Devon Kiss, who was friends with both Kelley and Sparks, attempted to intercept Kelley so that Kiss could tell Kelley he did not think coming to the Brofford residence was a good idea. (*Id*. at 165). Kiss had been in the Brofford's basement along with Stover when Kelley talked to Sparks on the phone, so he was aware Kelley was on his way to the Brofford residence. (*Id*. at 167). Kiss was unsuccessful in intercepting Kelley. (*Id*. at 169).

{¶21} As Kelley walked toward the Brofford residence, Sparks, Stover, and others came outside and met Kelley in the yard. (*Id*. at 24). An argument ensued between Sparks and Kelley, which turned into a fight between the two individuals. (*Id*.) Nick Sparks took Kelley to the ground and was getting the better of Kelley in the fight. (*Id*.); (*Id*. at 205). As the two fought, Stover yelled that Kelley was "get[ting] what he deserve[d]." (Tr. Vol. III at 62-63). Luke Parish, who had come with Kelley and was also observing the fight, told Stover to "stay out of it." (*Id*. at 64). At that time, Scott Brofford came up behind Luke Parish and struck

Parish in the back of the head.[5] (*Id*. at 65). Brofford then ordered Parish to get into Kelley's car, and chased Parish around the car. (*Id*. at 65-67). Brofford then said to those present, "Beat their ass and make sure they don't come back here."[6] (Tr. at 125).

{¶22} Following Brofford's statement, Brofford, Brofford's son Wes, a boy named Billy, and Stover rushed at Kelley, who was on the ground on his back underneath Sparks, and began kicking him. (Tr. Vol. II at 173-74); (Tr. Vol. II at 205). All those who testified at trial that observed the scene said Stover was the first to run at Kelley and begin kicking him. (*Id*.); (Tr. Vol. II at 125); (Tr. Vol. II at 174).

{¶23} Stover kicked Kelley in the head, and continued kicking him, according to Michael Gayle, "at least 20 times." (Tr. Vol. II at 126). As Stover kicked Kelley, Gayle and Kelley testified that Stover said Kelley was getting what he deserved for defending his brother.[7] (Tr. Vol. II at 121). Devon Kiss testified that the kicking of Kelley went on for "minutes." (Tr. Vol. II at 175). Gayle testified that Kelley was kicked by the group approximately 50-75 times, accounting for at least 15-17 kicks each. (Tr. at 147)

---

[5] Scott Brofford was the adult father of Wes Brofford.
[6] That is the quote according to Michael Gayle. Luke Parish testified that Scott Brofford yelled "get these boys and teach 'em a lesson." (Tr. Vol. III at 66). Ashley Wintersteller testified that "Scott Brofford started yelling and ended up saying, get 'em boys." (Tr. Vol. II. At 205).
[7] Gayle's testimony was that Stover said "that's what you get for defending your bitch ass brother." (Tr. Vol. II at 121). Kelley testified that Stover said, "this is what you get for coming and sticking up for your brother." (*Id*. at 27).

{¶24} The kicking eventually died down when Scott Brofford walked away from Kelley. (Tr. Vol. II at 127). Michael Gayle testified that he pulled Sparks off of Kelley and got Kelley into the car they arrived in. (*Id.*) Gayle testified that at that time Kelley was going in and out of consciousness. (*Id.* at 131). In the car, Gayle and Parish could not locate Kelley's car keys. (*Id.* at 127). While they looked for the keys to try and leave, Scott Brofford, Stover, and others came back to the car and started pounding on it. (Tr. Vol. III at 68). Luke Parish testified that Scott Brofford then yelled, "if you ain't out in [sic] my driveway in five minutes I'm getting the gun." (*Id.* at 70).

{¶25} Gayle and Parish then got Kelley out of Kelley's car since they could not find Kelley's keys, got into Ashley Winterstellar's vehicle and Wintersteller drove them away from the Brofford residence. (Tr. Vol. II at 207). As they left, 9-1-1 was called and they were told to meet an emergency squad at a nearby McDonalds.[8] (*Id.* at 207-208). During the trip, Gayle testified that Kelley continued to go to and from consciousness. (Tr. Vol. II at 131). Gayle added that Kelley was vomiting and bleeding all over himself. (*Id.*) Luke Parish testified that Kelley's eyes were swollen shut, and that he had a two to three inch knot coming out of his head. (Tr. Vol. III at 72). Parish also testified that Kelley could

---

[8] Luke Parish had called his father, Ken, when Luke and Gayle could not locate Kelley's keys and Scott Brofford and Stover started banging on the car. Ken Parish testified that while he was on the phone with Luke he could hear the banging on the car in the background. (Tr. Vol. III at 100). After the call, Ken left to drive to the Brofford residence, and had his fiancé call 9-1-1. (*Id.* at 101).

not really talk and was unable to do anything. (*Id.*) Ashley Wintersteller testified that Kelley had blood on his face, that his eyes were swollen, and that Kelley was vomiting in her car. (Tr. Vol. II at 208).

{¶26} At the McDonalds, Kelley was placed on a "backboard and a cervical collar to protect his spinal cord," loaded into an ambulance, and taken to the emergency room. (Tr. Vol. II at 101). At the hospital, Dr. Matthew Sanders examined Kelley. Dr. Sanders initially "noted abrasions and swelling about [Kelley's] face * * * swelling above his left eye * * * [and] some dried blood around the nose. * * * [A] bit of blood near the right ear. But [Dr. Sanders] couldn't visualize the eardrum due to that blood." (*Id.* at 102). Dr. Sanders also "noted a laceration on [Kelley's] * * * face below the eye. And one above the left brow, abrasions on his forehead and abrasions on his flank, and then contusions about his face[.]" (*Id.* at 102).

{¶27} Dr. Sanders ordered a C T Scan of Kelley's head, his face, and his cervical spine, and also an x-ray of his mid-back, the thoracic spine, and a urinalysis. (*Id.* at 103). On the C T of the facial bones, the radiologist noted a "right frontal scalp hematoma" but there were no fractures. (*Id.* at 104). Dr. Sanders testified that he had to physically pry open Kelley's left eye to examine it. (*Id.* at 106). Dr. Sanders also testified that due to the facial swelling a comprehensive exam was not possible at the time. (*Id.*) Dr. Sanders' ultimate

diagnosis was "facial contusions, abrasions, facial laceration and reported assault." (*Id*. at 109).

{¶28} Kelley testified that he had no memory of his interaction with Dr. Sanders. (*Id*. at 84). Pictures of Kelley's condition when he was at the hospital were introduced into the record. The pictures show that Kelley's face was bruised and bloodied all over, and his left eye was completely blackened shut. (State's Ex. 4).

{¶29} Kelley was subsequently discharged from the hospital, but was seen for a follow-up examination the next day, January 24, 2011, by Dr. Krueger. (Tr. Vol. IV at 7). Dr. Krueger testified that when he saw Kelley, Kelley "looked horrible, absolutely beaten up, impressive." (*Id*. at 10). Dr. Krueger testified that he remembered a tremendous amount of swelling about Kelley's eyes. (*Id*.) Dr. Krueger also testified that Kelley "had significant swelling along the right jaw line [and] [d]ifficulty opening his mouth." (*Id*.) Dr. Krueger "noted that [Kelley] had massive hematoma on the entire right side of his face * * * [and] some scattered abrasions elsewhere on his body." (*Id*. at 10).

{¶30} Dr. Krueger testified that Kelley was "quite uncomfortable" during the exam, so he "increased the strength of the pain medication." (*Id*. at 12). Dr. Krueger testified that it was likely Kelley would need two to three weeks to recover from the injuries. (*Id*. at 12). At trial, Dr. Krueger was shown

photographs taken of Kelley and Dr. Krueger testified that Kelley actually looked worse when he saw Kelley than Kelley did in the photographs. (*Id.* at 16). Due to the swelling in Kelley's eyes, Dr. Krueger could not get an adequate assessment of Kelley's right eye, so he referred Kelley to a specialist. (*Id.* at 12-13).

{¶31} Dr. Krueger referred Kelley to Dr. Jennifer Morrison, an ophthalmologist, to have Kelley's eyes further examined. Kelley saw Dr. Morrison the following day, on January 25, 2011. (Tr. Vol. III at 108). Dr. Morrison examined Kelley and testified that she typically graded "swelling anywhere from one plus to four plus. One plus being minor swelling, two plus a little bit more[.] * * * Four plus being the most severe swelling." (*Id.* at 110). Dr. Morrison testified that Kelley's swelling in each eye was a three to a four plus. (*Id.* at 111).

{¶32} Dr. Morrison testified that Kelley could only open his eyes a few millimeters and could not open one eye without significant pain. (*Id.* at 111). Ultimately, on the first visit, Dr. Morrison diagnosed Kelley with "periocular contusion, which is a bruising around the eyes, [and] traumatic iritis from the white blood cells seen in the front chamber of the eye." (*Id.* at 117). Dr. Morrison also testified that Kelley would not be able to drive with his degree of swelling, and that Kelley had blurry vision. (*Id.* at 119).

{¶33} Dr. Morrison had a second visit with Kelley on February 4, 2011, as she could not fully examine him on his first visit due to the swelling. (*Id.* at 121). In the second visit, Dr. Morrison added the diagnosis of "subconjunctival hemorrhage," and "commotio retinae" in the left eye.[9] (*Id.* at 127).

{¶34} Of his injuries, Kelley testified that his eyes were "severely bruised and swollen." (Tr. Vol. II at 34). Kelley testified that he could not fully open his eyes for weeks and that he had black eyes for a couple months. (*Id.*) Kelley also testified that the white part of his eyes was red "for two, three months." (*Id.*)

{¶35} Kelley testified that as a result of the injuries "his whole head hurt." (*Id.*) His "temple, ear, [and] jaw hurt the most for the first few days." (*Id.*) Kelley testified his jaw was badly bruised and that it hurt to talk or chew. (*Id.* at 35). Kelley testified that his sides "were bumped, abraised out really far and red. It was like that for days." (*Id.* at 37). Kelley testified that his "face was probably swollen for a whole month, but it was still black and blue for months after." (*Id.* at 37). Kelley testified that he had multiple scars as a result of this incident. (*Id.* at 36).

{¶36} Kelley testified that immediately after the incident he "wasn't able to go out, or drive, or go to school." (*Id.*) Kelley testified that he tried to go back to school two weeks after the incident and "they wouldn't let me go back because of

---

[9] These medical terms were explained in further detail to the jury. None of the conditions Kelley was diagnosed with were permanent.

all the attention I would bring to myself because of how badly my face was bruised." (*Id*.)

{¶37} Luke Parish testified that he saw Kelley approximately a week after the incident. Parish testified that Kelley looked "like someone walking in with a mask on." (*Id*. at 179). Parish testified that Kelley "didn't look [like] a human." (*Id*.).

{¶38} Kelley's mother testified that the bruising on Kelley increased over the course of the first week and that the swelling remained. (Tr. Vol. III at 145). She testified that Kelley's eyes were swollen closed for "probably two weeks." (*Id*. at 145). Kelley's mother testified that after the incident, Kelley "didn't do anything. He laid on the couch. He was not able to attend school. He was not able to go to work. He didn't drive. He wasn't on his computer. He was not able to study. He didn't do anything but lay on the couch." (*Id*. at 149). Kelley's mother testified that this went on for about two weeks. (*Id*. at 150).

{¶39} Kelley's mother further testified that "after about two and-a-half weeks the swelling had gone down in [Kelley's] eyes. And it took about six week[s] before the bruising around his eyes went away. And about the same time the abrasions on his head and around his eyes was going away also." (*Id*. at 152-53). Kelley's mother testified that from this incident Kelley had a scar on his

forehead, a scar from the cut under his eye, and a large scar on his back. (*Id*. at 153.)

**{¶40}** After the incident, Stover talked to both Kelley and Devon Kiss. Kelley testified that Stover asked him "to please not bring him into this situation. That he did not want this to affect the rest of his life." (Tr. Vol. II at 44). Kiss testified that Stover asked Kiss to lie about Stover's whereabouts on the date of the incident. (Tr. Vol. II at 178).

**{¶41}** In Stover's case-in-chief, Stover called Dr. Bullock who had examined Kelley's medical files but had not personally examined Kelley. Dr. Bullock testified that Kelley's injuries did not constitute "serious physical harm" under the Ohio Revised Code's definitions. (Tr. Vol. IV at 30-33).

**{¶42}** On appeal, Stover first argues that there was insufficient evidence to convict him on the basis that the State did not establish Kelley was seriously physically harmed. However, the State presented evidence that could constitute "serious physical harm" under three of the five prongs of the definition of serious physical harm pursuant to R.C. 2901.01(A)(5).

**{¶43}** First, the State presented evidence that there was "some temporary, substantial incapacity[.]" R.C. 2901.01(A)(5)(c). The State introduced testimony that for weeks after the incident Kelley could not work or attend school, and that

Kelley could not drive. The State also introduced testimony that Kelley's ability to read, write, chew, and talk were impacted.

**{¶44}** Second, the State presented evidence of "some permanent disfigurement[.]" R.C. 2901.01(A)(5)(d). Both Kelley and his mother testified to Kelley having scars from the incident on his face and back. In addition, the State presented evidence of "some temporary, serious disfigurement." R.C. 2901.01(A)(5)(d). The State introduced testimony that Kelley's face was extremely bruised and swollen to the point Luke Parish thought Kelley did not look human *a week after the incident*. Kelley's appearance was also so distracting that he was not able to return to school because the school thought the other students would have difficulty concentrating with him around.

**{¶45}** Third, the State produced evidence of "physical harm * * * that involves any degree of prolonged or intractable pain." R.C. 2901.01(A)(5)(e). Dr. Krueger testified that he increased the strength of the pain medication Kelley was prescribed and that Kelley would need two to three weeks to be pain free.

**{¶46}** Based on the foregoing, we find that sufficient evidence was introduced under any of these three prongs to satisfy the State's burden of proof regarding "serious physical harm." Accordingly, Stover's first assignment of error is overruled.

{¶47} In Stover's second assignment of error he argues that his Felonious Assault conviction was against the manifest weight of the evidence. In making this argument, Stover first contends that even if there was sufficient evidence introduced for the jury to find that "serious physical harm" was present in this case, the jury's finding of serious physical harm was against the weight of the evidence.

{¶48} As we discussed previously, there were several different avenues the jury could have properly found that Kelley suffered serious physical harm. While Stover's witness, Dr. Bullock, attempted to rebut this in his testimony, Kelley was permanently scarred in multiple locations and seriously bruised requiring a significant amount of recovery time.[10] Pictures introduced into the record showed that fifteen days after the incident Kelley's eyes were still filled with blood.[11] In addition, Kelley and his mother testified that it was several weeks before the swelling receded.[12]

---

[10] The Ninth District found in *State v. Brown*, 9th Dist. No. 04CA008510, 2005-Ohio-2141, that where a victim was hit in the head with a gun, the lingering scar on the victim's head constituted a permanent disfigurement. The court thus found the finding of serious physical harm was not against the weight of the evidence. *Brown*, ¶ 17.

[11] State's Exhibits 13 and 22 illustrate a dramatic difference in the appearance of Kelley. The photographs show how severely swollen Kelley's eyes and face were shortly after the incident versus how he looked weeks later, where the swelling had gone down but the blood in Kelley's eyes remained.

[12] The Eighth District found in *State v. Williams*, 8th Dist. No. 83402, 2004-Ohio-4085, that where a victim was taken to the hospital for bruises, was ordered to stay home for two days, and had scars on his legs from the incident defendant's conviction for Felonious Assault was not against the manifest weight of the evidence. *Williams*, ¶ 27.

**{¶49}** Moreover, we would note that the jury was instructed on both Felonious Assault and Assault, so the jury clearly considered whether "serious physical harm" was present in this case. Based on the evidence presented, we cannot find that the jury "clearly lost its way" or that there was a "manifest miscarriage of justice" regarding this issue.

**{¶50}** Finally, Stover contends that the testimony of several of the State's witnesses was inconsistent and thus the verdict was against the weight of the evidence. In making this argument, Stover first contends that Kelley's testimony was inconsistent. Stover argues that Kelley was unable to identify the individuals who kicked him. However, even *if* Kelley's testimony was inconsistent on this issue, Ashley Wintersteller, Michael Gayle, Luke Parish, and Devon Kiss all testified that Stover was one of the individuals involved in kicking Kelley.

**{¶51}** Stover contends that Kelley's testimony was also inconsistent regarding his injuries. Stover claims that Kelley had said he could not see at all after the incident, but the day after his injuries Kelley "might have sent a text out" and used Facebook on his phone. The State counters by arguing that there was no proof presented that Kelley sent any messages or accessed his Facebook page. The State also argues that there was no testimony as to when any alleged text messages were sent, and that if they were, they could have been sent before any swelling worsened. As there is no established proof on this matter in the record,

we cannot find any error here. In addition, even assuming the inconsistency, it would not alter the fact of the permanent scars, the severe bruising, or the testimony of the doctors.

{¶52} Stover next argues that Michael Gayle's testimony was inconsistent. Stover contends that Gayle had testified in a previous trial that Sparks told Kelley on the phone to come out to the Brofford residence to fight. This matter is wholly irrelevant, as it is the actions of Stover and others in kicking Kelley on the ground after the fight began between Kelley and Sparks that led to the charges in this case. Moreover, Gayle's prior testimony does not indicate that Kelley went to the Brofford residence to fight, it merely indicates that *Sparks* intended to fight, thus there is no showing of any inconsistency.

{¶53} Lastly, Stover contends that Ashley Wintersteller's and Luke Parish's testimony was inconsistent in who they named as part of the group kicking Kelley. However, Wintersteller and Parish testified in this trial they saw Stover kick Kelley and several others testified the same. In fact, this testimony is not contradicted. Therefore we cannot find that any inconsistencies would show that there was a "manifest miscarriage of justice."

{¶54} Based on the foregoing, we do not find that the jury's verdict was against the manifest weight of the evidence. Accordingly, Stover's first and

second assignments of error are overruled and the judgment of the Union County

Common Pleas Court is affirmed.

***Judgment Affirmed***

**PRESTON, P.J. and ROGERS, J., concur.**

**/jlr**