[Cite as *State v. McCoy*, 2020-Ohio-4511.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
MARION COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                CASE NO.  9-18-23

      v.

JOSHUA MCCOY,                      O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Marion County Common Pleas Court
Trial Court No. 17-CR-0532

**Judgment Affirmed**

Date of Decision:   September 21, 2020

APPEARANCES:

    *Todd A. Workman* **for Appellant**

    *Nathan R. Heiser* **for Appellee**

**PRESTON, J.**

{¶1} Defendant-appellant, Joshua McCoy ("McCoy"), appeals the July 16, 2018 judgment of sentence of the Marion County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} This case arises from a December 15, 2017 incident in which McCoy struck and allegedly sexually assaulted his five-year-old niece, J.G. On December 27, 2017, the Marion County Grand Jury indicted McCoy on Count One of rape in violation of R.C. 2907.02(A)(2), a first-degree felony and Count Two of rape in violation of R.C. 2907.02(A)(1)(b), a first-degree felony. (Doc. No. 1). On January 2, 2018, McCoy appeared for arraignment and pleaded not guilty to the counts of the indictment. (Doc. No. 7).

{¶3} On April 19, 2018, the Marion County Grand Jury issued a superseding indictment which included five counts: Count One of rape in violation of R.C. 2907.02(A)(1)(b), a first-degree felony; Count Two of rape in violation of R.C. 2907.02(A)(1)(b), a first-degree felony; Count Three of abduction in violation of R.C. 2905.02(A)(2), a third-degree felony; Count Four of endangering children in violation of R.C. 2919.22(B)(2), a third-degree felony; and Count Five of felonious assault in violation of R.C. 2903.11(A)(1), a second-degree felony. (Doc. No. 52). Counts One and Two included the specification that the victim was less than ten years of age at the time of the offense. (*Id.*). Count One specified that McCoy

purposely compelled the victim to submit by force or threat of force. (*Id.*). On April 23, 2018, McCoy appeared for arraignment and pleaded not guilty to the counts of the superseding indictment. (Doc. No. 69).

{¶4} The case proceeded to a jury trial on April 24-26, 2018. (Doc. No. 113). At the close of the State's case, McCoy made a motion for acquittal under Crim.R. 29, which the trial court denied. (Apr. 24-26, 2018 Tr. at 445-449). On April 26, 2018, the jury found McCoy guilty of all counts. (Doc. Nos. 75, 76, 77, 78, 79, 113). With respect to Count One, the jury found that: (1) McCoy did purposely compel the victim to submit by force or threat of force and (2) the victim was less than ten years of age when the offense occurred. (Doc. No. 75). With respect to Count Two, the jury found that the victim was less than ten years of age when the offense occurred. (Doc. No. 76). The trial court accepted the jury's verdicts and found McCoy guilty of all counts. (Doc. No. 113).

{¶5} A sentencing hearing was held on July 10, 2018. (*Id.*). Pursuant to the agreement of the parties, the trial court found that Counts One, Two, and Three merged for the purpose of sentencing. (July 10, 2018 Tr. at 12-13); (Doc. No. 113). The trial court further found that Counts Four and Five merged for the purpose of sentencing. (July 10, 2018 Tr. at 13); (Doc. No. 113). Accordingly, the State elected to sentence McCoy on Counts One and Five. (Doc. No. 113). The trial court sentenced McCoy to a sentence of life imprisonment without parole on Count One

and eight years in prison on Count Five, to be served consecutively. (*Id.*). The trial court also designated McCoy a Tier III sexual offender and advised him of his duties to register. (*Id.*). The trial court then dismissed Counts Two, Three, and Four. (*Id.*).[1] On July 16, 2018, the trial court filed its judgment entry of sentence. (*Id.*).

{¶6} On July 18, 2018, McCoy filed his notice of appeal. (Doc. No. 114). He raises four assignments of error for our review. We consider his assignments of error in the order presented and, for ease of discussion, we will address McCoy's first two assignments of error together.

### Assignment of Error No. I

**The trial court/jury erred to the prejudice of the Defendant/Appellant in entering guilty verdicts to the one count of Rape, the one count of Abduction, and the one count of Felonious Assault as the evidence was insufficient to support the convictions.**

### Assignment of Error No. II

**The trial court/jury erred to the prejudice of the Defendant/Appellant in entering a guilty verdict to the one count of Rape, the one count of Abduction, and the one count of Felonious Assault as they are not supported by the manifest weight of the evidence.**

---

[1] The Supreme Court of Ohio has instructed that the procedure to be used in merging allied offenses for sentencing does not involve dismissing the determination of guilt for the merged offense. *See State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, ¶ 27, *superseded by state statute on other grounds*, *United States v. Mackey*, S.D.Ohio No. 3:04cr00096, 2014 WL 6606434, *2 (Nov. 20, 2014), fn. 4. ("Because R.C. 2941.25(A) protects a defendant only from being punished for allied offenses, the determination of the defendant's guilt for committing allied offenses remains intact, both before and after the merger of allied offenses for sentencing. Thus, the trial court should not vacate or dismiss the guilt determination."). Accordingly, the trial court did not act in accordance with R.C. 2941.25(A) by dismissing the merged counts. However, because the State did not object to the trial court's dismissal of the merged counts and because McCoy is not prejudiced by the trial court's dismissal of the merged counts, we choose not to address the issue further.

{¶7} In his first assignment of error, McCoy argues that his rape, abduction, and felonious assault convictions are based on insufficient evidence. In his second assignment of error, McCoy argues that the same convictions are against the manifest weight of the evidence.

{¶8} Manifest "weight of the evidence and sufficiency of the evidence are clearly different legal concepts." *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997). Accordingly, we address each legal concept individually.

{¶9} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.).

*See also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19 ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *Thompkins* at 386.

{¶10} On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

{¶11} "Circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof." *Jenks*, 61 Ohio St.3d at paragraph one of the syllabus. "A conviction can

be sustained based on circumstantial evidence alone." *State v. Franklin*, 62 Ohio St.3d 118, 124 (1991). "[I]n some instances, certain facts can only be established by circumstantial evidence" and a conviction based thereon "is no less sound than one based on direct evidence." *State v. Smith*, 12th Dist. Butler No. CA2008-03-064, 2009-Ohio-5517, ¶ 80. "If the state 'relies on circumstantial evidence to prove an [essential] element of the offense charged, there is no [requirement that the evidence must be] irreconcilable with any reasonable theory of innocence in order to support a conviction[,]' so long as the jury is properly instructed as to the burden of proof, i.e., beyond a reasonable doubt." *State v. Bates*, 6th Dist. Williams No. WM-12-002, 2013-Ohio-1270, ¶ 50, quoting *Jenks* at paragraph one of the syllabus.

{¶12} As an initial matter, although McCoy challenges the sufficiency and weight of the evidence supporting the jury's findings of guilt as to the abduction count under Count Three of the indictment, we need not address those arguments. *See State v. Miller*, 3d Dist. Logan No. 8-19-02, 2019-Ohio-4121, ¶ 11. "'When counts in an indictment are allied offenses, and there is sufficient evidence to support the offense on which the state elects to have the defendant sentenced, the appellate court need not consider the sufficiency [or weight] of the evidence on the count that is subject to merger because any error would be harmless' beyond a reasonable doubt." *Id.*, quoting *State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, ¶ 14, citing *State v. Powell*, 49 Ohio St.3d 255, 263 (1990),

*superseded by state constitutional amendment on other grounds*, *Smith*, 80 Ohio St.3d at 102, fn. 4 and citing *State v. Henderson*, 7th Dist. Mahoning No. 15 MA 0137, 2018-Ohio-5123, ¶ 9. Accordingly, error, if any, with respect to the sufficiency or weight of the evidence supporting McCoy's abduction conviction is harmless beyond a reasonable doubt because that count was merged with Count One. Specifically, McCoy was not convicted of abduction because the trial court merged that offense for the purpose of sentencing. *Id.* at ¶ 12, citing *State v. Turner*, 2d Dist. Clark No. 2017-CA-78, 2019-Ohio-144, ¶ 22 and *Ramos* at ¶ 16. *See State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, ¶ 6, *superseded by state statute on other grounds*, *United States v. Mackey*, S.D.Ohio No. 3:04cr00096, 2014 WL 6606434, *2 (Nov. 20, 2014), fn. 4, quoting R.C. 2941.25(A) ("'Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.'") "Indeed, the Supreme Court of Ohio has explicitly stated that a 'conviction' requires both a finding of guilt and a sentence." *Miller* at ¶ 12, citing *Ramos* at ¶ 16, citing *State v. Henderson*, 58 Ohio St.2d 171, 178 (1979). Accordingly, we will not address McCoy's arguments challenging the sufficiency and weight of the evidence supporting his abduction conviction under Count Three. *See Ramos* at ¶ 13, 18.

{¶13} McCoy was convicted of rape in violation of R.C. 2907.02(A)(1)(b) and felonious assault in violation of R.C. 2903.11(A)(1). The offense of rape is codified under R.C. 2907.02, which provides, in pertinent part:

(A)(1) No person shall engage in sexual conduct with another person who is not the spouse of the offender * * *, when any of the following applies:

* * *

(b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.

R.C. 2907.02(A)(1)(b). "In order to prove rape under R.C. 2907.02(A)(1)(b), the State must prove the offender engaged in sexual conduct with a person less than thirteen years of age, whether or not the offender knew the age of the other person." *State v. Jones*, 2d Dist. Montgomery No. 26289, 2015-Ohio-4116, ¶ 42. "'Sexual conduct' means vaginal intercourse between a male and female; * * * and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal * * *opening of another[.]" R.C. 2907.01(A). "Penetration, however slight, is sufficient to complete vaginal * * * intercourse." *Id*.

{¶14} The jury also found that two specifications applied to McCoy's rape conviction. The first specification alleged that the victim was less than ten years of

age at the time of the offense. The second specification alleged that McCoy purposely compelled the victim to submit by force or threat of force. "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A). "'Force' means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). "Force or the threat of force 'can be inferred from the circumstances surrounding sexual conduct.'" *State v. Kaufman*, 187 Ohio App.3d 50, 2010-Ohio-1536, ¶ 53 (7th Dist.), quoting *State v. Schaim*, 65 Ohio St.3d 51 (1992), paragraph one of the syllabus.

{¶15} The offense of felonious assault is codified in R.C. 2903.11, which provides, in relevant part: "No person shall knowingly * * * [c]ause serious physical harm to another * * *." R.C. 2903.11(A)(1). The requisite culpable mental state for felonious assault is "knowingly." "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). "Serious physical harm" is any of the following:

(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

R.C. 2901.01(A)(5).

{¶16} At trial, the State first offered the testimony of Jeremy Gilbert ("Gilbert"), McCoy's brother and J.G.'s father. (Apr. 24-26, 2018 Tr. at 152-154). Gilbert testified that his daughter, J.G., was born in 2012 and was five years old at the time of the trial and at the time of the relevant events. (*Id.* at 153).

{¶17} Gilbert also testified to a series of events that occurred on December 14-15, 2017. (*Id.* at 154). Gilbert stated that he, J.G., and McCoy had moved into a house at 626 Park Street in Marion, Ohio several days prior to December 14, 2017. (*Id.* at 154-156). According to Gilbert, he and McCoy spent the evening of

December 14, 2017 drinking alcohol. (*Id.* at 156-157). At approximately 1:00 a.m. on December 15, 2017, Gilbert left J.G. and McCoy in the house alone together when he drove to his sister's house in Lima, approximately one hour away, to run an errand. (*Id.* at 157-158). Gilbert testified that he had nearly reached his destination when he received three "hysterical" telephone calls from McCoy. (*Id.* at 158-160). In the telephone calls, McCoy explained to Gilbert that McCoy woke up to J.G. screaming and found an intruder in her bedroom. (*Id.* at 159). McCoy told Gilbert that he fought the intruder off of J.G. and chased the intruder out of the house. (*Id.*). Gilbert testified that he did not immediately return to the house after receiving the calls from McCoy because he was almost to his destination and believed that his errand would be completed quickly. (*Id.* at 160). However, Gilbert testified that once he arrived at his sister's house in Lima, he was arrested for violating a civil protection order. (*Id.* at 160-161).

{¶18} On cross-examination, Gilbert admitted that when he left the house to drive to his sister's house in Lima, both he and McCoy were "pretty intoxicated." (*Id.* at 165-167). Gilbert stated that when he left the house, J.G. was in bed and McCoy was still awake. (*Id.* at 167).

{¶19} Next, Ryan Strange ("Strange"), McCoy's cousin, testified that he received a telephone call from McCoy at 7:28 a.m. on December 15, 2017 asking him to drive McCoy to a court appointment in Lima that morning. (Apr. 24-26,

2018 Tr. at 169-171). McCoy also told Strange that J.G. had been hurt during the night and that he found a man on top of J.G., hitting her. (*Id.* at 170-171). In a subsequent telephone call, McCoy elaborated on the details of the attack and told Strange that he found the assailant on top of J.G., attacking the child, and that he chased the assailant out of the house and stopped pursuit when he fell and twisted his ankle. (*Id.* at 171-172, 177).

{¶20} Strange arrived at 626 Park Street and observed J.G. sleeping on the couch. (*Id.* at 174-175). Strange immediately noticed that J.G. had two black eyes. (*Id.* at 175). Strange identified State's Exhibit 20 as a photograph of J.G. with two black eyes. (*Id.* at 175-176). (*See* State's Ex. 20). Strange stated that although J.G. is depicted with two black eyes in State's Exhibit 20, she actually looks "a lot better" in the photograph than she did when he observed her on the morning of December 15, 2017. (Apr. 24-26, 2018 Tr. at 176). (*See* State's Ex. 20). Specifically, in the photograph, her eyes are depicted with some redness around them, but when he observed J.G., her eyes were "very dark" and black. (Apr. 24-26, 2018 Tr. at 176). (*See* State's Ex. 20). Strange further stated that J.G. would not speak to him. (Apr. 24-26, 2018 Tr. at 175).

{¶21} Strange testified that right before he, McCoy, and J.G. entered Strange's car to begin the drive to Lima, Strange observed McCoy hug J.G. and tell her, "I'm sorry that I couldn't get the bad man. I never wanted the bad man to hurt

you. I'll make sure this never happens again." (*Id.* at 181). Strange stated that during this exchange, J.G. appeared shaken up and scared. (*Id.*).

{¶22} Strange stated that after they dropped off McCoy at the courthouse in Lima, Strange and J.G. waited in his car in a parking lot nearby. (*Id.* at 183). Strange stated that he was not aware that people were looking for J.G. until several law enforcement officers approached his vehicle searching for J.G. (*Id.* at 183, 185).

{¶23} The State's next witness was Lieutenant Chad Lauck ("Lieutenant Lauck"), a patrol supervisor with the Allen County Sheriff's Department. (Apr. 24-26, 2018 Tr. at 191-192). Lieutenant Lauck testified that on December 15, 2017, he received a message from a woman who was concerned about her child's whereabouts and well-being after learning that the child's father, Gilbert, had been arrested by the agency overnight. (*Id.* at 192-194). After contacting several of Gilbert's family members, Lieutenant Lauck spoke to Gilbert's sister, who notified him that McCoy was en route to the Allen County Municipal Court for a court appearance and that J.G. and another man were in the car with him. (*Id.* at 194-195). Gilbert's sister stated that the little girl appeared to be injured. (*Id.*).

{¶24} Lieutenant Lauck testified that he was concerned about the girl's safety, so he went to the municipal court to speak to McCoy. (*Id.* at 195). Lieutenant Lauck located McCoy and inquired into the whereabouts of the girl. (*Id.* at 196-197). According to Lieutenant Lauck, McCoy initially told him that the girl

was in Marion. (*Id.* at 197). However, eventually, McCoy reluctantly admitted that the girl was in a car in the parking lot. (*Id.*). McCoy told Lieutenant Lauck that the girl had been beaten by an intruder in Marion. (*Id.* at 197-198).

{¶25} At that time, Lieutenant Lauck and several other law enforcement officers located Strange and J.G. in a vehicle nearby the courthouse. (*Id.* at 198-199). Lieutenant Lauck testified that he observed J.G. in the back seat of the vehicle and was concerned because her face appeared swollen and she had discoloration around her eyes. (*Id.* at 199-200). Lieutenant Lauck testified that the girl depicted in State's Exhibit 20 was the girl that he observed in the back seat of the car. (*Id.* at 200). (*See* State's Ex. 20). Lieutenant Lauck testified that one of the law enforcement officers at the scene carried the girl into the Lima Police Department. (Apr. 24-26, 2018 Tr. at 200-201). When they arrived in the building, one of the officers called for an ambulance. (*Id.*).

{¶26} On cross-examination, Lieutenant Lauck stated that when he observed the girl in the car, it was "quite apparent there was something wrong." (*Id.* at 203). However, according to Lieutenant Lauck, she was not talking. (*Id.* at 204).

{¶27} Next, the State offered the testimony of Investigator Deana Lauck ("Investigator Lauck"), an investigator with the Lima Police Department. (*Id.* at 206-207). Investigator Lauck testified that she was on duty on December 15, 2017, when she observed several law enforcement officers bringing J.G. down the

hallway. (*Id.* at 207-208). Investigator Lauck testified that the individual depicted in State's Exhibit 20 was J.G. (*Id.* at 208). (*See* State's Ex. 20). Investigator Lauck stated that J.G. appeared "disheveled" and it was immediately apparent to Investigator Lauck that the girl "had been beaten" because she had injuries to both of her eyes. (Apr. 24-26, 2018 Tr. at 208-210). Investigator Lauck also noticed an injury to J.G.'s mouth or lip. (*Id.* at 209).

{¶28} After observing J.G.'s condition, Investigator Lauck attempted to talk to J.G. and noted that the child "seemed to be very dazed." (*Id.* at 209). Investigator Lauck testified that J.G. did not appear interested in acknowledging the male law enforcement officers, but J.G would acknowledge her by nodding or shaking her head in response to questions. (*Id.* at 209-210). Investigator Lauck testified that J.G. seemed "like she was in shock." (*Id.* at 211). Shortly thereafter, medical personnel arrived and J.G. "shut down." (*Id.*). However, J.G. continued to acknowledge Investigator Lauck, so she accompanied J.G. to the hospital and stayed with her the entire time that she was there. (*Id.* at 211-213).

{¶29} Lieutenant Ed Brown ("Lieutenant Brown"), an officer with the Marion County Sheriff's Office, testified that on the evening of December 15, 2017 he was dispatched to 626 Park Street to take photographs and collect evidence. (*Id.* at 244-245, 247).

{¶30} Lieutenant Brown identified State's Exhibit 24 as a photograph of a pile of objects located on a bed. (*Id.* at 254). (*See* State's Ex. 24). Included in the pile of objects in the photograph were two white pillowcases and a pair of girl's underwear that were stained with what Lieutenant Brown suspected was blood. (Apr. 24-26, 2018 Tr. at 254-257). (*See* State's Ex. 24). Lieutenant Brown identified State's Exhibit 24-A as a photograph of the underwear. (Apr. 24-26, 2018 Tr. at 257-258). (*See* State's Ex. 24-A). Lieutenant Brown identified State's Exhibit 9 as the child-sized underwear that he collected as potential evidence from 626 Park Street. (Apr. 24-26, 2018 Tr. at 258-259). (*See* State's Ex. 9). Lieutenant Brown showed the jury the suspected blood stains on the underwear, located inside the crotch and through the back of the garment. (Apr. 24-26, 2018 Tr. at 261); (State's Ex. 9). Lieutenant Brown identified State's Exhibit 10 as two white pillowcases, stained with suspected blood, which he collected from 626 Park Street on December 15, 2017. (Apr. 24-26, 2018 Tr. at 261-263). (*See* State's Ex. 10). Lieutenant Brown also identified State's Exhibit 11 and State's Exhibit 12 as two blankets covered in suspected vomit, which he collected as potential evidence from 626 Park Street on December 15, 2017. (Apr. 24-26, 2018 Tr. at 263-266). (*See* State's Exs. 11, 12).

**{¶31}** On cross-examination, Lieutenant Brown testified that the underwear, pillowcases, and blankets he collected from 626 Park Street on December 15, 2018 were not sent to the laboratory for testing. (Apr. 24-26, 2018 Tr. at 269-272).

**{¶32}** The State next offered the testimony of Rhonda Norris ("Norris"), a SANE at St. Rita's Medical Center ("St. Rita's"). (*Id.* at 280-281). The State moved the trial court to recognize Norris as an expert in sexual assault nursing examination, and the trial court granted the State's motion without objection. (*Id.* at 284).

**{¶33}** Norris testified that on December 15, 2017, she was called to St. Rita's to assess a young girl who had been found in the back seat of a car and had sustained some injuries. (*Id.* at 284-285). When Norris arrived at the hospital, she came into contact with J.G. and immediately observed that the young girl had "significant injuries to the face." (*Id.* at 285-286). Norris testified that she tried to talk to J.G. and build a rapport. (*Id.* at 293). However, J.G. was "very quiet" and reluctant to talk to Norris. (*Id.* at 289, 293). Accordingly, J.G. would not disclose to Norris what had happened to her or how she sustained the injuries. (*Id.* at 293).

**{¶34}** Norris stated that she performed a sexual assault examination on J.G. (*Id.* at 290, 293). Norris identified State's Exhibit 13 as a printout of J.G.'s medical records from her visit to St. Rita's on December 15, 2017. (*Id.* at 287-288). (*See* State's Ex. 13). Norris further identified State's Exhibit 13-A as the documentation

relating to her sexual assault examination of J.G. (Apr. 24-26, 2018 Tr. at 291-293). (*See* State's Ex. 13-A).

**{¶35}** Norris also identified State's Exhibit 14 an electronic copy of the photographs that she took during her sexual assault examination of J.G. on December 15, 2017. (Apr. 24-26, 2018 Tr. at 294-295). (*See* State's Ex. 14). Norris described the injuries she observed on J.G.'s body during the sexual assault examination and identified the injuries on the photographs contained in State's Exhibit 14. (Apr. 24-26, 2018 Tr. at 298-307). (*See* State's Ex. 14).

**{¶36}** Norris testified that she observed heavy bruising around J.G.'s eyes and neck. (Apr. 24-26, 2018 Tr. at 298, 305). (*See* State's Ex. 14). Norris stated that the bruising around J.G.'s eyes appeared to be the result of blunt force trauma. (Apr. 24-26, 2018 Tr. at 305). (*See* State's Ex. 14). Specifically, the bruising on both sides of the face indicated to Norris that J.G. may have been hit on the nose. (Apr. 24-26, 2018 Tr. at 307). (*See* State's Ex. 14). Additionally, J.G. had dried blood on both sides of her nose, indicating a bloody nose. (Apr. 24-26, 2018 Tr. at 306). (*See* State's Ex. 14). Norris also described J.G.'s face as being swollen. (Apr. 24-26, 2018 Tr. at 306). (*See* State's Ex. 14).

**{¶37}** Additionally, Norris observed petechiae on J.G.'s upper chest, neck, conjunctiva, and the skin immediately surrounding her eyes. (Apr. 24-26, 2018 Tr. at 303-304). (*See* State's Ex. 14). Norris stated that petechiae are small dots that

appear when capillaries rupture and blood leaks into the skin. (Apr. 24-26, 2018 Tr. at 302-303). Norris testified that when an individual has his or her airway obstructed, either through strangulation or because someone is covering the mouth and nose, the action puts pressure on the blood vessels. (*Id*. at 302-303). When the pressure becomes too great, the blood vessels burst, causing petechiae. (*Id.*). With respect to the petechiae observed on J.G.'s eyes, Norris testified that the ruptured blood vessels she observed were "actually quite large for being petechiae," and are therefore indicative that J.G.'s airway was restricted at some point in time, whether through strangulation or having her mouth and nose covered. (*Id.* at 301-302). (*See* State's Ex. 14). Norris also testified that the petechiae observed on J.G.'s neck are significant because it "very well could be" the result of someone putting his or her hands around J.G.'s neck. (Apr. 24-26, 2018 Tr. at 300-301). (*See* State's Ex. 14). Moreover, Norris stated that, in her experience, the petechiae she observed on J.G.'s body were "significant" compared to petechiae she has observed on other patients. (Apr. 24-26, 2018 Tr. at 304).

{¶38} Norris testified that she performed a genital examination on J.G. and observed no injuries to J.G.'s genitals. (*Id.* at 314). However, Norris stated that in her experience performing sexual assault examinations, it is not common for victims of sexual assault, particularly children, to have injuries to their genitals. (*Id.* at 314-315). Norris also observed J.G.'s hymen, which is a transparent piece of tissue

inside the vagina. (*Id.* at 315, 318). Norris testified that she did not note any injuries to J.G.'s hymen. (*Id.* at 318). However, Norris stated that a young girl of J.G.'s age could have her vagina penetrated and her hymen remain intact. (*Id.* at 318). Norris testified that several factors could account for a lack of visual injury to the hymen of an individual who had been sexually penetrated. (*Id.*). First, in a prepubescent female, like J.G., the hymen is very vascular and tends to heal very quickly following injury. (*Id.* at 315-318). Additionally, Norris stated that a smaller penis that is not completely erect could penetrate the hymen without causing injury. (*Id.* at 318-319). Finally, Norris stated that one can penetrate the vagina without touching, or even coming near, the hymen. (*Id.* at 319).

{¶39} As part of her examination, Norris completed a sexual assault evidence collection kit. (*Id.* at 307). Norris identified State's Exhibit 2 as the sexual assault evidence collection kit relating to her December 15, 2017 examination of J.G. (*Id.* at 308-309). (*See* State's Ex. 2). Included in State's Exhibit 2 were a copy of State's Exhibit 13-A, vaginal smears, a DNA swab of J.G., and perianal, oral, and fingernail swabs that Norris took during her examination of J.G. (Apr. 24-26, 2018 Tr. at 308-311); (State's Ex. 2). Norris noted that J.G. was not wearing underwear when she arrived at the hospital. (Apr. 24-26, 2018 Tr. at 312). Accordingly, Norris was unable to collect J.G.'s underwear, which is something that is typically done during a sexual assault examination. (*Id.*). However, Norris collected the pants that J.G.

was wearing on December 15, 2017 at St. Rita's. (*Id.* at 312-313). Norris identified the pants she collected from J.G. as State's Exhibit 4. (*Id.*). (*See* State's Ex. 4). Norris recounted that when she took the pants off of J.G., she noticed that J.G. had been wearing the pants inside out. (Apr. 24-26, 2018 Tr. at 313).

{¶40} On cross-examination, Norris confirmed that during her examination she used several instruments that allow her to more easily observe injuries to the genitals and the presence of bodily fluids, such as semen, pre-ejaculate, and blood. (*Id.* at 321-324). Norris reviewed State's Exhibit 13-A and confirmed that she documented "[n]o acute injuries" with respect to J.G.'s genital region, including swelling, tearing, abrasions, or bruising. (*Id.* at 333-334). (*See* State's Ex. 13-A). Norris testified that although tearing, bruising, and swelling of the vaginal tissue can be possible evidence of sexual assault, she clarified that it is "not usual" to observe such evidence during sexual assault examinations. (Apr. 24-26, 2018 Tr. at 324-325). Norris also confirmed that she did not observe any possible dried blood, possible dried semen or seminal fluid, or foreign pubic hairs during her examination of J.G. (*Id.* at 334). (*See* State's Ex. 13-A).

{¶41} Although petechiae can be caused by strangulation, Norris confirmed that there are other causes of petechiae, such as an "infectious" or "noninfectious" condition" and physical trauma. (Apr. 24-26, 2018 Tr. at 334-335). Norris stated that it is possible for excessive coughing to cause petechiae, but clarified that the

coughing would have to be "[r]eally harsh." (*Id.* at 335). Norris also confirmed that petechiae can be caused by excessive crying, but conditioned that it would have to be "very, very harsh crying." (*Id.* at 335).

{¶42} On redirect examination, Norris testified that, hypothetically, if a grown male just slightly inserted his penis into a five-year-old girl's vagina, she would not expect to observe injury to the young girl's genitals. (*Id.* at 335-336). Norris also testified that if a victim of sexual assault "cleaned up" the genital area, Norris would not expect to find bodily fluids in the victim's vagina during the sexual assault examination. (*Id.* at 336).

{¶43} Next, the State offered the testimony of Brittany Mulinix ("Mulinix"), a forensic scientist in the biology unit of the Ohio Bureau of Criminal Investigation ("BCI"). (*Id.* at 339). The State moved the trial court to recognize Mulinix as an expert witness, and the trial court granted the State's motion without objection. (*Id.* at 340-341).

{¶44} Mulinix identified State's Exhibit 17 as the report she wrote relating to her investigation of the possible evidence submitted by the Lima Police Department relating to the present case. (*Id.* at 345-346). (*See* State's Ex. 17). Mulinix testified that she performed semen testing on the perivaginal, perianal, and oral samples that Norris collected from J.G. during the sexual assault examination. (Apr. 24-26, 2018 Tr. at 348, 352-353). (*See* State's Ex. 17). However, she did not

find any semen identified in the samples. (Apr. 24-26, 2018 Tr. at 348, 352-353). (*See* State's Ex. 17). However, Mulinix stated that, hypothetically, if bodily fluids had been present in a child's vaginal area, but that the child had been cleaned, the cleaning could diminish or affect the presence of bodily fluids or DNA. (Apr. 24-26, 2018 Tr. at 353).

{¶45} Mulinix stated that although underwear were not submitted as part of the sexual assault examination collection kit, she was able to examine State's Exhibit 4, the pants that Norris collected during her examination of J.G. (*Id.* at 350-351). (*See* State's Exs. 4, 17). Mulinix testified that she collected samples and performed testing for blood and semen on both sides of the pants. (Apr. 24-26, 2018 Tr. at 351). (*See* State's Ex. 17). Mulinix attested that she did not identify any semen on the inside or the outside of the pants. (Apr. 24-26, 2018 Tr. at 351). (*See* State's Ex. 17). However, she did positively identify presumptive blood on the inside layer of the pants. (Apr. 24-26, 2018 Tr. at 352). (*See* State's Ex. 17).

{¶46} The State's next witness was Logan Schepeler ("Schepeler"), a forensic scientist in the DNA testing unit at BCI. (Apr. 24-26, 2018 Tr. at 358). The State moved the trial court to recognized Schepeler as an expert witness in forensic DNA analysis, and the trial court granted the State's motion without objection. (*Id.* at 360-361).

{¶47} Schepeler testified that he performed two types of DNA analysis on several samples derived from the pants previously identified as State's Exhibit 4. (*Id.* at 361, 363-364). (*See* State's Ex. 4). Schepeler first performed a "traditional" DNA test on the samples taken from State's Exhibit 4 which tested for the presence of both male and female DNA. (Apr. 24-26, 2018 Tr. at 365-366). Schepeler testified that the results of the DNA analysis revealed that the DNA present in the samples were mixtures, meaning that more than one person's DNA was present in the sample. (*Id.* at 365-366). However, the only person whose DNA Schepeler could conclusively determine was present in the samples was J.G. (*Id.* at 365-366). (*See* State's Ex. 18). Next, Schepeler performed Y-STR testing, which is male-specific DNA testing that examines only the Y chromosome, on the samples. (Apr. 24-26, 2018 Tr. at 367). (*See* State's Ex. 18). Schepeler attested that the results of the testing indicate that a mixture of DNA was found on the pants, meaning that more than one male's DNA was present in the samples. (Apr. 24-26, 2018 Tr. at 367-368). (*See* State's Ex. 18). Schepeler stated that the results could not conclusively exclude McCoy's DNA from the mixture, however, he could not conclusively state the McCoy's DNA was present in the mixture. (Apr. 24-26, 2018 Tr. at 368). (*See* State's Ex. 18). In State's Exhibit 18, Schepeler documented his findings relating to the samples taken from J.G.'s pants. (Apr. 24-26, 2018 Tr. at 362). (*See* State's Ex. 18).

{¶48} Schepeler also tested the perivaginal and perianal samples taken from the sexual assault evidence collection kit. (Apr. 24-26, 2018 Tr. at 369-370). (*See* State's Ex. 19). Schepeler testified that his testing revealed no DNA profile foreign to J.G. present in the samples. (Apr. 24-26, 2018 Tr. at 369-370). (*See* State's Ex. 19). Schepeler documented his findings relating to the perivaginal and perianal samples in State's Exhibit 19. (Apr. 24-26, 2018 Tr. at 369-370); (State's Ex. 19).

{¶49} According to Schepeler, hypothetically, if a young child was wearing a pair of pants and that person was carried by two different people, it is possible that any individual who carried the child or touched the child's clothing could leave DNA on the child's clothing or skin. (Apr. 24-26, 2018 Tr. at 366). Schepeler also agreed that, hypothetically, if a person is lying on an item such as a blanket, the blanket could transfer DNA onto that person. (*Id.* at 366-367). Schepeler testified that if, following a sexual assault, a victim is cleaned with fluid or water, it is possible that the cleaning would affect the presence of any foreign DNA present on that individual. (*Id.* at 370).

{¶50} On cross-examination, Schepeler clarified that State's Exhibit 18, which sets forth the conclusions from the Y-STR testing, lists McCoy as "inconclusive" "[d]ue to the number of contributors." (*Id.* at 370-371). (*See* State's Ex. 18). Accordingly, Schepeler could not state whether McCoy contributed to the male DNA mixture found on J.G.'s pants. (Apr. 24-26, 2018 Tr. at 371).

Case No. 9-18-23

Additionally, Schepeler confirmed that he did not know the identity of the other male contributors to the DNA mixture found on the pants.  (*Id.* at 371).

**{¶51}** The State's final witness was Detective Steven J. Stechschulte, Jr. ("Detective Stechschulte"), a detective with the Lima Police Department.  (*Id.* at 381-382).  On December 15, 2017, Detective Stechschulte was walking to the Lima Police Department when he noticed several law enforcement officers in the city building parking lot engaged in conversation with the occupant of a vehicle.  (*Id.* at 383).  Detective Stechschulte identified the vehicle occupant as Strange.  (*Id.* at 384).  A short time later, Detective Stechschulte encountered Lieutenant Lauck, who requested Detective Stechschulte's assistance in an investigation involving a girl who had been found in a vehicle in the city building parking lot.  (*Id.* at 384-385).

**{¶52}** Shortly thereafter, Detective Stechschulte met J.G. and tried to engage in conversation with her.  (*Id.* at 385-386).  He described J.G. as very "withdrawn" and stated that she "appeared skittish" or "traumatized."  (*Id.* at 386).  Detective Stechschulte also immediately noticed that J.G. had "severely blackened eyes," a swollen mouth and face, and blood on her clothes and the inside of her nostrils.  (*Id.* at 387).  Emergency medical services arrived shortly thereafter to transport J.G. to the hospital.  (*Id.*).

**{¶53}** Detective Stechschulte spent several hours conducting interviews of individuals involved with J.G. and her family.  (*Id.* at 388).  That evening, Detective

-27-

Stechschulte interviewed McCoy. (*Id.* at 388-389). Detective Stechschulte testified that his interview of McCoy was recorded and identified State's Exhibit 15 as a redacted copy of his December 15, 2017 interview of McCoy. (*Id.* at 391-392). Thereafter, State's Exhibit 15 was played for the jury. (*Id.* at 392-394). (*See* State's Ex. 15).

{¶54} State's Exhibit 15 depicts Detective Stechschulte and McCoy in an interview room at the Lima Police Department. (Apr. 24-26, 2018 Tr. at 392-393); (State's Ex. 15). Initially, McCoy told Detective Stechschulte a story about waking up the previous night to J.G. screaming in a room upstairs. (State's Ex. 15). McCoy told Detective Stechschulte that when he ran upstairs to investigate, he observed an intruder standing over J.G. and hitting her. (*Id.*). McCoy stated that he fought off the intruder and chased him out of the house. (*Id.*). McCoy confirmed that Gilbert was in Lima visiting their sister and was not home during the attack. (*Id.*). McCoy told Detective Stechschulte that he calmed down J.G., who had thrown up, and cleaned blood and vomit off the girl. (*Id.*). Then, he called Gilbert and told him that J.G. had been attacked by an intruder. (*Id.*).

{¶55} Thereafter, State's Exhibit 15 depicts Detective Stechschulte detailing logical inconsistencies with McCoy's story of an intruder, such as that an intruder would have to walk past McCoy, who was supposedly sleeping on a chair next to the door, to reach J.G. in her bedroom upstairs. (*Id.*). Additionally, Detective

Stechschulte indicated several injuries and scratches on McCoy's arms, hands, and face. (*Id.*). Detective Stechsculte also told McCoy that if he was concealing something, "science" and DNA would prove it. (*Id.*).

{¶56} Shortly thereafter, McCoy stated, "The story's a lie. There's no excuse, but I just know that I was really, really * * * drunk. * * * I remember hitting her." (*Id.*). McCoy initially denied sexually assaulting J.G. (*Id.*) Eventually, however, McCoy stated, "I am sick. I do have a [sexual] disease, and I do need help." (*Id.*). Thereafter, although McCoy claimed that he was under the influence of alcohol and could not remember the details, McCoy admitted that he tried to sexually assault J.G. (*Id.*).

{¶57} McCoy stated, "I don't think I molested her, but I did try." (*Id.*). When Detective Stechschulte asked McCoy, "How far do you think you got?," McCoy responded, "I don't remember penetrating her." (*Id.*). McCoy denied performing or attempting to perform oral sex on J.G., but he stated that he did not remember whether he tried to have J.G. perform oral sex on him. (*Id.*). McCoy claimed that the alcohol that he consumed earlier in the evening made him "spacey" and it was difficult to remember the details. (*Id.*).

{¶58} Later in the interview, Detective Stechschulte asked McCoy whether they were "going to find some penetration on [J.G.]." (*Id.*). McCoy responded, "I don't know for sure. I don't remember. I remember trying. I do remember trying."

(*Id.*). When Detective Stechschulte asked McCoy whether his penis "got in just a bit maybe," McCoy responded, "Maybe." (*Id.*). When Detective Stechschulte asked McCoy how far his penis "got in" J.G.'s vagina, McCoy replied, "I don't know for sure. I do remember trying." (*Id.*). McCoy confirmed that J.G. was crying when he was trying to penetrate her with his penis. (*Id.*).

{¶59} When Detective Stechschulte asked McCoy if J.G.'s saliva would be found on his penis, McCoy responded that he "didn't know." (*Id.*). Later, Detective Stechschulte asked McCoy again, "You think at best, you got [your penis] in [J.G.'s vagina] a little bit?" (*Id.*). McCoy responded, "Yeah." (*Id.*). Shortly thereafter, McCoy stated again that he remembered that he was "trying" to penetrate J.G. and she fought him. (*Id.*).

{¶60} McCoy stated that during the assault, J.G. started scratching him, which angered McCoy and caused him to begin hitting her. (*Id.*). McCoy admitted that J.G.'s nose bled as a result of his strikes to her face. (*Id.*). McCoy stated that after the assault he felt remorse and he told J.G. that a "bad guy" hurt her so that she would believe that another person injured her. (*Id.*). McCoy denied that he put his hands around J.G.'s neck and strangled her, but he admitted that he pushed her down and tried to hold her down. (*Id.*). McCoy admitted that he "might have" put his hand over J.G.'s mouth to muffle her screams during the attack. (*Id.*). He also

admitted that he removed J.G.'s pants and underwear and pulled down his own pants. (*Id.*).

{¶61} After the State played State's Exhibit 15 for the jury, Detective Stechschulte stated that when he questioned McCoy about whether he performed oral sex on J.G., he gave a "hard denial." (Apr. 24-26, 2018 Tr. at 403-404). Accordingly, Detective Stechschulte was "pretty convinced" that McCoy was being honest about that denial. (*Id.* at 403-404). However, Detective Stechschulte testified that when he asked McCoy about other forms of penetration, such as penetration of J.G.'s vagina with his penis, McCoy would say "probably" and "possibly" because he did not want to talk about those acts in depth. (*Id.* at 404). Detective Stechschulte stated that the actions that McCoy was giving "soft admissions" to regarding being on top of J.G. and attempting to penetrate her began to match up with the physical evidence, such as the defensive injuries to McCoy's face and arms. (*Id.* at 404-405).

{¶62} Detective Stechschulte identified State's Exhibits 27, 28, 29, and 31 as photographs taken of McCoy at the Lima Police Department on December 15, 2017. (*Id.* at 397-398). (*See* State's Exs. 27, 28, 29, 31). State's Exhibits 27 and 28 depict scratches above McCoy's right and left eyes, respectively. (State's Exs. 27, 28); (Apr. 24-26, 2018 Tr. at 398-399). State's Exhibit 29 depicts a scratch to McCoy's upper lip. (State's Ex. 29); (Apr. 24-26, 2018 Tr. at 399-400). State's

Exhibit 31 depicts McCoy's right hand, including an abrasion on his far right knuckle. (State's Ex. 31); (Apr. 24-26, 2018 Tr. at 400-401).

{¶63} Detective Stechschulte testified that he interviewed McCoy again on December 18, 2017 because he believed that McCoy was not telling him the full story and he hoped that if he interviewed McCoy again, McCoy would be more forthcoming. (Apr. 24-26, 2018 Tr. at 406-407). Specifically, in the first interview, McCoy claimed that he had blacked out due to his alcohol consumption and did not regain consciousness until he was hitting J.G. (*Id.* at 407). However, Detective Stechschulte testified that upon reviewing McCoy's phone, he learned that McCoy sent out several fairly coherent text messages during the time period that he claimed to be unconscious. (*Id.* at 407-408). Detective Stechschulte testified that based on Detective Stechschulte's training in alcohol detection, apprehension, and prosecution, McCoy's claims of blacking out for hours until he regained consciousness did not make sense. (*Id.* at 408). Accordingly, Detective Stechschulte testified that he believed that McCoy remembered more details of the assault than he admitted during the first interview. (*Id.*).

{¶64} Detective Stechschulte identified State's Exhibit 16 as a redacted recording of a second interview that he conducted with McCoy at the Lima Police Department on December 18, 2017. (*Id.* at 406). (*See* State's Ex. 16). Thereafter, State's Exhibit 16 was played for the jury. (Apr. 24-26, 2018 Tr. at 407). (*See*

State's Ex. 16). State's Exhibit 16 depicts Detective Stechschulte and McCoy in an interview room at the Lima Police Department on December 18, 2017. (State's Ex. 16). When Detective Stechschulte asked McCoy to fill in the gaps from his interview on December 15, 2017, McCoy claimed that he "blacked out" after Gilbert left. (*Id.*). McCoy then claimed that the next time he regained consciousness was when he was hitting J.G. (*Id.*).

**{¶65}** Detective Stechschulte told McCoy that his story of not being conscious for a prolonged period of time was not consistent with an examination of McCoy's phone, which indicated that McCoy was sending coherent text messages at various times during the night. (*Id.*). McCoy provided several additional details to Detective Stechschulte, such as the fact that the sexual assault occurred upstairs in J.G.'s bedroom. (*Id.*). McCoy again stated that he realized what he was doing was wrong when he regained consciousness as he was hitting J.G. (*Id.*). McCoy stated that after the assault they went downstairs and J.G. threw up. (*Id.*). McCoy told Detective Stechschulte that he cleaned vomit and blood off of J.G. (*Id.*).

**{¶66}** Later in the interview, Detective Stechschulte stated, "You probably put it in [J.G.'s vagina] a little bit, right?" (*Id.*). In response, McCoy nodded. (*Id.*). However, soon thereafter, McCoy again stated that it was not until he was hitting J.G. that he regained consciousness and realized what was happening. (*Id.*). However, McCoy stated that when he was hitting her he realized that he was "trying

-33-

to * * * molest her [or] rape her * * * or have sex." (*Id.*).  McCoy claimed that he did not really know if he did "stick it in" or "rape" J.G.  (*Id.*).  Later in the interview, Detective Stechschulte commented to McCoy that he "might have had [his penis] in [her vagina] just a little bit." (*Id.*).  In response, McCoy stated, "Um hm." (*Id.*).

{¶67} Detective Stechschulte acknowledged that some of the evidence that was collected in the course of his investigation was not sent to BCI for analysis and testing.  (Apr. 24-26, 2018 Tr. at 411).  According to Detective Stechschulte, due to the large volume of agencies submitting potential evidence to BCI, the agency has a policy to only test a limited number of items in each case.  (*Id.* at 411-412).  With respect to the underwear Lieutenant Brown collected at 626 Park Street on December 15, 2017, Detective Stechschulte stated that the underwear was not sent for analysis because J.G. did not put them back on following the assault.  (*Id.* at 412).

{¶68} On cross-examination, Detective Stechschulte acknowledged that he told McCoy during his interviews that if he did sexually assault J.G., "science" would be able to prove it.  (*Id.* at 420-421).  Detective Stechschulte testified that making the comment that "science" would be able to prove a crime is an interview technique he uses to help elicit the truth from a suspect.  (*Id.* at 430).

{¶69} At the conclusion of the State's evidence, the State moved to admit its exhibits and rested.  (*Id.* at 435-444).  State's Exhibits 15 and 16 were admitted over

McCoy's objection. (*Id.* at 439-440, 444). The rest of the State's exhibits were admitted without objection. (*Id.* at 435-444).

{¶70} Thereafter, McCoy made a Crim.R. 29 motion for a directed verdict on all counts, which the trial court denied. (*Id.* at 445-449). McCoy rested without putting on any evidence. (*Id.* at 450). The case was submitted to the jury, which found McCoy guilty of all counts. (*Id.* at 543-546).

{¶71} First, we will address McCoy's argument that his rape conviction is not supported by sufficient evidence. Specifically, McCoy argues that the State did not offer sufficient evidence to support a finding that penetration occurred. (Appellant's Brief at 12). Because McCoy only challenges the sufficiency of the State's evidence showing that he penetrated J.G.'s vagina, we focus solely on whether the State presented sufficient evidence to prove this element.

{¶72} With respect to the issue of penetration, we find that a reasonable jury could have found that McCoy penetrated J.G.'s vagina with his penis. As previously outlined, the insertion need only be slight to be considered vaginal penetration. "'The vagina is the hollow passage leading from the uterus of the female body outward to the exterior genitalia, or vulva, which is comprised of lip-like folds of skin called the labia majora. The term "vaginal cavity" refers to that entire anatomical process and any part of it.'" *State v. Meador*, 12th Dist. Warren No. CA2008-03-042, 2009-Ohio-6548, ¶ 11, quoting *State v. Grant*, 2d Dist.

Montgomery No. 19824, 2003-Ohio-7240, ¶ 29. "'Penetration of the vaginal cavity requires introduction of an object from without, which necessarily implies some forceful spreading of the labia majora. The penetration need only be "slight"'. R.C. 2907.01(A). Therefore, if the object is introduced with sufficient force to cause the labia majora to spread, penetration has occurred.'" *Id.* at ¶ 12 quoting *Grant* at ¶ 30. *See also State v. Lucas*, 2d Dist. Montgomery No. 18644, 2001 WL 1103288, *3 (Sept. 21, 2001) ("It is sufficient if the evidence shows that the force of the object caused the outer lips of the victim's vagina, the labia, to spread."); *State v. Nieves*, 9th Dist. Lorain No. 12CA010255, 2013-Ohio-4093, ¶ 9 quoting *State v. Melendez*, 9th Dist. Lorain No. 08CA009477, 2009-Ohio-4425, ¶ 14 ("'[I]nsertion, however slight, of a part of the body or other object within the vulva o[r] labia is sufficient to prove vaginal penetration for purposes of proving sexual conduct as defined in R.C. 2907.01(A) and rape in violation of R.C. 2907.02.'"); *State v. Fulkerson*, 8th Dist. Cuyahoga No. 83566, 2004-Ohio-3114, ¶ 21 ("[E]vidence of slight penetration, entering the vulva or labia, is sufficient to support a rape conviction."); *State v. Farr*, 3d Dist. Seneca No. 13-06-16, 2007-Ohio-3136, ¶ 17 (finding that the trial court did not err by broadly defining vaginal cavity in response to a jury question).

{¶73} The record reflects that, during his interviews with Detective Stechschulte, McCoy repeatedly and freely admitted that he was attempting to

penetrate J.G.'s vagina with his penis. McCoy also admitted several times that he "probably" or "maybe" achieved penetration to a slight degree. McCoy further admitted that he had pulled down his pants and had removed J.G.'s pants and underwear and was holding down J.G.'s body while he attempted to insert his penis into her vagina. Further, McCoy stated that J.G. was crying while he attempted to penetrate her. Accordingly, we find that the State presented sufficient testimony from which the jury could infer that McCoy introduced his penis into J.G.'s vulva or labia. *See State v. Gilbert*, 10th Dist. Franklin No. 04AP-933, 2005-Ohio-5536, ¶ 9-10, 35-36 (concluding that the State presented sufficient evidence of penetration where the victim testified that the defendant "put his finger on the outside of the labia" and "touched the inside less than a centimeter," that the defendant's finger was "near the top" of the vaginal cavity for several seconds, and that the victim did not perceive the defendant's actions to constitute penetration); *State v. Clemmons*, 2d Dist. Montgomery No. 22747, 2009-Ohio-2066, ¶ 20 (finding sufficient evidence to uphold a rape conviction where the victim testified that the defendant "touched" her genital areas with his penis and fingers causing her pain); *State v. Falkenstein*, 8th Dist. Cuyahoga No. 83316, 2004-Ohio-2561, ¶ 15-16 (finding sufficient evidence of penetration where the victim closed her legs and the defendant placed his penis "on the outside" of the victim's vagina); *Melendez* at ¶ 16-17, 21, 30-31 (finding sufficient evidence of penetration where the victim stated that the defendant

touched her "in the area she wipes after going to the bathroom" and the defendant admitted he placed his hand inside the victim's pants "for an extended period of time" but denied penetration); *Meador* at ¶ 13, 16 (the victim's statement that it "kind of felt like" the Defendant's fingers were in her vagina was sufficient to establish that penetration occurred); *State v. Rowland*, 12th Dist. Warren No. CA2019-08-084, 2020-Ohio-2984, ¶ 18, 21 ("Although A.R. used the term 'touch' as opposed to 'insert' when describing Rowland's actions, a jury could reasonably conclude that Rowland necessarily inserted part of his finger into A.R.'s vagina" when he touched her clitoris.); *State v. Higgins*, 7th Dist. Jefferson No. 12 JE 11, 2013-Ohio-2555, ¶ 29 (a defendant's confession that he penetrated the victim's vagina establishes sufficient evidence of penetration).

{¶74} Nevertheless, McCoy argues that the State failed to prevent evidence of penetration because the victim did not testify at the trial, Norris observed no injury to J.G.'s hymen, and the evidence did not establish that McCoy's semen or DNA was found on J.G.'s body. We are not persuaded.

{¶75} First, a rape victim is not required to testify to the issue of penetration if the State can provide sufficient evidence of penetration through other evidence or testimony. *See State v. Edinger*, 10th Dist. Franklin No. 05AP-31, 2006-Ohio-1527, ¶ 41 (finding the defendant's statements to the police regarding penetration were sufficient to uphold a conviction for rape). As detailed above, the State presented

sufficient evidence to establish the element of penetration even without J.G.'s testimony. We are likewise unpersuaded by McCoy's argument that his conviction is not based on sufficient evidence because the sexual assault nurse examiner did not observe injury to J.G.'s pubic area or hymen. First, it is well-established that the State is not required to produce evidence of physical injury to the victim's hymen or pubic area to establish penetration if penetration can be established through other evidence or testimony. *See Gilbert*, 2005-Ohio-5536, at ¶ 28, 38 (finding sufficient evidence of penetration where the child victim's hymen was intact and the physician testified that there was no physical "evidence of penetration into the vagina"); *State v. Vang*, 9th Dist. Summit No. 23206, 2007-Ohio-46, ¶ 12 ("[A] reasonable juror could find that penetration and an intact hymen are not mutually exclusive."); *State v. Leonard*, 8th Dist. Cuyahoga No. 98626, 2013-Ohio-1446, ¶ 46 ("[A] physical injury is not a condition precedent to a conviction for rape; not all rape victims exhibit signs of physical injury."). Moreover, Norris's observations during her sexual assault examination of J.G. were not inconsistent with the State's theory of the case that McCoy slightly penetrated J.G.'s vagina with his penis. Norris testified that due to the elastic nature of the hymen of a child of J.G.'s age, she would not necessarily expect to observe injury to the genitals or hymen of a child who had been sexually assaulted or whose genitals were penetrated. In fact, Norris testified that it is quite uncommon for child victims of sexual assault to have observable

physical injury to their genitals. Accordingly, even without evidence of physical injury to J.G.'s genitals or hymen, the State presented sufficient evidence for the jury to conclude that McCoy penetrated J.G.'s vagina.

{¶76} McCoy's argument that the State failed to present sufficient evidence to demonstrate penetration because his semen or DNA was not found in the samples collected from J.G.'s body and clothing also fails. We first note that the State was not required to prove that McCoy ejaculated during the commission of the rape. *See State v. Bush*, 4th Dist. Ross No. 09CA3112, 2009-Ohio-6697, ¶ 45 ("[T]he crime of rape does not require the State to prove that the defendant achieved a sexual climax."). In fact, according to the State's theory of the case, McCoy only inserted his penis slightly into J.G.'s vagina. The State did not allege that McCoy achieved a sexual climax during the assault. Accordingly, the absence of sperm in the samples tested is not inconsistent with the State's theory of the case. Likewise, because the State presented other evidence from which the jury could reasonably infer that vaginal penetration occurred, the absence of McCoy's bodily fluid or genetic material on J.G.'s body is not fatal to the State's case. *See State v. Gaines*, 5th Dist. Stark No. 2005CA00099, 2005-Ohio-5794, ¶ 44-45 (holding that the State met its burden of production for each element of the crime of rape even with a "lack of DNA evidence" and "less than perfect police investigation").

{¶77} Thus, for the foregoing reasons, viewing the evidence in a light most favorable to the State, a rational trier of fact could have found that the State proved the penetration element of rape.

{¶78} Having determined that McCoy's rape conviction was supported by sufficient evidence, we next address McCoy's argument that his felonious assault conviction is not supported by sufficient evidence. With respect to his felonious assault conviction, McCoy argues that the State did not offer sufficient evidence to support a finding that J.G. suffered serious physical harm. (Appellant's Brief at 13-14). McCoy contends that the State only presented evidence that J.G. suffered minor bruising and petechiae and, therefore, failed to present sufficient evidence that J.G. suffered serious physical harm. Because McCoy only challenges the sufficiency of the State's evidence with respect to the requirement that he caused "serious physical harm" to J.G., our analysis will be limited to the State's evidence supporting that element.

{¶79} The record reflects that the responding officers observed the injuries to J.G.'s face and called an ambulance that transported J.G. to the hospital, where medical professionals assessed her. Norris testified that J.G. presented with "significant injuries to the face." J.G.'s injuries included "heavy bruising around both of her eyes" and swelling on her face. Norris stated that the bruising around J.G.'s eyes indicated to her that J.G. may have been hit on her nose. Additionally,

J.G. had dried blood under both of her nostrils, which indicated a bloody nose. In fact, during his interview with Detective Stechschulte, McCoy admitted to striking J.G. in the face and causing her nose to bleed. Moreover, J.G.'s injuries are depicted in a number of photographs taken during the course of J.G.'s physical examination.

{¶80} J.G. also presented with petechiae around her eyes and neck. Norris testified that she observed petechiae on J.G.'s upper chest, neck, conjunctiva, and the skin immediately surrounding her eyes. Norris's observations were also depicted in a series of photographs taken during the examination. Norris testified that the ruptured blood vessels she observed in J.G.'s eyes are "actually quite large for being petechiae" and that in her experience performing sexual assault examinations, the petechiae she observed on J.G.'s body were "significant." Although, as McCoy indicates, Norris conceded on cross-examination that petechiae can be caused by non-violent means, such as "very, very harsh crying" or "really harsh" coughing, Norris testified that J.G.'s injuries indicated to her that J.G.'s airway was restricted at some time. Moreover, Norris testified that the petechiae observed on J.G.'s neck are significant because it "very well could" be the result of someone putting his or her hands on J.G.'s neck. Moreover, during his interview with the police, McCoy admitted that he held J.G. down during the assault and that he "might have" put his hand over her mouth to muffle her screams.

**{¶81}** Accordingly, a rational jury, construing the evidence above in the light most favorable to the State, could reasonably have found that the State proved the element of serious physical harm beyond a reasonable doubt. Therefore, there is sufficient evidence that McCoy committed felonious assault under R.C. 2903.11(A)(1). *See State v. Stover*, 3d Dist. Union No. 14-12-24, 2013-Ohio-5665, ¶ 44 (concluding that the victim suffered serious physical harm under R.C. 2901.01(A)(5) because the victim's "face was extremely bruised and swollen"); *State v. Morris*, 7th Dist. Monroe No. 03 MO 12, 2004-Ohio-6810, ¶ 35 (concluding that the State presented sufficient evidence of serious physical harm, in part, because the victim testified that Morris's first punch caused his nose to bleed); *State v. Simmons*, 8th Dist. Cuyahoga No. 96208, 2011-Ohio-6074, ¶ 36-38 (finding serious physical harm where a witness testified that the victim suffered from petechiae in her eye even where the petechiae was not visible on the photographs admitted into evidence); *State v. Smith*, 9th Dist. Summit Nos. 23468 and 23464, 2007-Ohio-5524, ¶ 27 (finding that the severe physical harm existed where the victim presented with a "petechial rash" on her face and eyes resulting from strangulation).

**{¶82}** Having found that sufficient evidence supports McCoy's rape and felonious assault convictions, we now turn to McCoy's argument that his rape and felonious assault convictions are against the manifest weight of the evidence. In support of his argument that his rape and felonious assault convictions are against

the manifest weight of the evidence, McCoy simply reasserts the same arguments he raises with respect to the sufficiency of the evidence supporting his rape and felonious assault convictions. "'[A] defendant has the burden of affirmatively demonstrating the error of the trial court on appeal.'" *State v. Costell*, 3d Dist. Union No. 14-15-11, 2016-Ohio-3386, ¶ 86, quoting *State. v Stelzer*, 9th Dist. Summit No. 23174, 2006-Ohio-6912, ¶ 7. If an argument exists that can support an assignment of error, it is not this court's duty to root it out. *State v. Shanklin*, 3d Dist. Union No. 14-13-23, 2014-Ohio-5624, ¶ 31, citing *State v. Raber*, 189 Ohio App.3d 396, 2010-Ohio-4066, ¶ 30 (9th Dist.).

{¶83} Even so, after weighing the evidence and evaluating the credibility of the witnesses, with appropriate deference to the trier of fact's credibility determinations, we conclude that the jury did not clearly lose its way and create such a manifest miscarriage of justice that McCoy's rape and felonious assault convictions must be reversed.

{¶84} Accordingly, McCoy's first and second assignments of error are overruled.

### Assignment of Error No. III

**The Appellant's right to the effective assistance of Counsel guaranteed under Section 10, Article I of the Ohio Constitution, and Sixth and Fourteenth Amendments to the United States Constitution was not [sic] violated by Trial Counsel based upon the record before this Court.**

{¶85} In his third assignment of error, McCoy argues that he was denied the right to effective assistance of counsel as provided for by the United States Constitution and by the Ohio Constitution. Specifically, McCoy argues that Norris, who the trial court recognized as an expert witness in sexual assault nursing examinations, was not qualified to discuss the bruising and petechiae that she observed on J.G.'s body. (Appellant's Brief at 15-16). McCoy alleges that the State should not have been permitted to question Norris regarding bruising and petechiae she observed on J.G.'s head, neck, and shoulders because the injuries related to the charge of felonious assault, rather than sexual assault. (*Id.*). McCoy argues that because his trial counsel failed to object to the State's line of questioning regarding the injuries Norris observed on J.G.'s head, neck, and shoulders, he was denied the effective assistance of counsel. (*Id.*).

{¶86} "In criminal proceedings, a defendant has the right to effective assistance of counsel under both the United States and Ohio Constitutions." *State v. Evick*, 12th Dist. Clinton No. CA2019-05-010, 2020-Ohio-3072, ¶ 45. A defendant asserting a claim of ineffective assistance of counsel must establish: (1) the counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). In order to show counsel's conduct was deficient or unreasonable, the

defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland* at 689. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Frazier*, 61 Ohio St.3d 247, 255 (1991). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989), citing *State v. Lytle*, 48 Ohio St.2d 391, 396 (1976), *vacated in part on other grounds*, *Ohio v. Lytle*, 438 U.S. 910, 98 S.Ct. 3135 (1978).

{¶87} Prejudice results when "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Bradley* at 142, quoting *Strickland* at 694. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.*, quoting *Strickland* at 694. If the petitioner cannot prove one of the elements, it is "unnecessary for a court to consider the other prong of the test." *State v. Walker*, 3d Dist. Seneca No. 13-15-42, 2016-Ohio-3499, ¶ 20.

{¶88} Notwithstanding McCoy's assertions that his counsel was ineffective, McCoy's argument presented under his third assignment of error is completely

devoid of any discussion of the prejudice prong. "This in and of itself is insufficient under App.R. 16(A)(7) and in contravention of the standard that places the burden on the defendant to prove both prongs of the ineffective assistance of counsel claim." *State v. Hayes*, 8th Dist. Cuyahoga No. 105048, 2017-Ohio-7718, ¶ 16, citing *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, ¶ 223, citing *Strickland* at 687, and *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, ¶ 62. Because McCoy failed to satisfy his burden of demonstrating that he was prejudiced by his trial counsel's alleged errors, we decline to root out any argument for him. *See Hayes* at ¶ 19 ("Having failed to demonstrate prejudice even if we presumed a deficient performance and having failed to address the statutory presumption of guilt, as required under App.R 16(A)(7) to prove an error occurred, Hayes's second assignment of error must be overruled."); *State v. Watkins,* 3d Dist. Putnam No. 12-18-08, 2018-Ohio-4722, ¶ 28 ("'[I]f it is easier to dispose of an ineffective claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'"), quoting *Bradley* at 143; *State v. Franks*, 9th Dist. Summit No. 28533, 2017-Ohio-7045, ¶ 16 ("Where an appellant fails to develop an argument in support of his assignment of error, this Court will not create one for him."). *See* App.R. 12(A)(2); App.R. 16(A)(7); *State v. Stillman*, 5th Dist. Delaware No. 04CAA07052, 2004-Ohio-6974, ¶ 58-74.

{¶89} Accordingly, McCoy's third assignment of error is overruled.

**Assignment of Error No. IV**

**Appellant's maximum sentence of life imprisonment without the possibility of parole for the conviction of Rape and eight years of imprisonment to be served consecutively thereto for the conviction of Felonious Assault was not supported by the requisite statutory findings found in ORC § 2929.12.**

{¶90} In his fourth assignment of error, McCoy argues that the trial court erred by sentencing him to a term of life imprisonment without parole for Count One and eight years' imprisonment for Count Five.

{¶91} Under R.C. 2953.08(G)(2), an appellate court will reverse a sentence "only if it determines by clear and convincing evidence that the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law." *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, ¶ 1. Clear and convincing evidence is that "'which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *Id.* at ¶ 22, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶92} "'Trial courts have full discretion to impose any sentence within the statutory range.'" *State v. Smith*, 3d Dist. Seneca No. 13-15-17, 2015-Ohio-4225, ¶ 9, quoting *State v. Noble*, 3d Dist. Logan No. 8-14-06, 2014-Ohio-5485, ¶ 9, citing *State v. Saldana*, 3d Dist. Putnam No. 12-12-09, 2013-Ohio-1122, ¶ 20. Rape of a child less than ten years of age carries a maximum penalty of life imprisonment

without parole. R.C. 2907.02(A)(1)(b), (B) (Jan. 1, 2008) (current version at R.C. 2907.02(A)(1)(b), (B) (Mar. 22, 2020)). As a second-degree felony, felonious assault carries a sanction of two to eight years' imprisonment. R.C. 2903.11(A)(1), (D)(1)(a) (Oct. 17, 2017) (current version at R.C. 2903.11(A)(1), (D)(1)(a) (Mar. 22, 2019)); R.C. 2929.14(A)(2) (Oct. 17, 2017) (current version at R.C. 2929.14(A)(2) (Mar. 22, 2019)).

{¶93} Here, McCoy was sentenced to life imprisonment without parole on Count One and eight years' imprisonment as to Count Five.[2] Accordingly, the trial court's sentence is within the statutory range. "'[A] sentence imposed within the statutory range is "presumptively valid" if the [trial] court considered applicable sentencing factors.'" *State v. Nienberg*, 3d Dist. Putnam Nos. 12-16-15 and 12-16-16, 2017-Ohio-2920, ¶ 10, quoting *State v. Maggette*, 3d Dist. Seneca No. 13-16-06, 2016-Ohio-5554, ¶ 31, quoting *State v. Collier*, 8th Dist. Cuyahoga No. 95572, 2011-Ohio-2791, ¶ 15.

{¶94} R.C. 2929.11 provides, in pertinent part, that the "overriding purposes of felony sentencing are to protect the public from future crime by the offender and others, to punish the offender, and to promote the effective rehabilitation of the offender using the minimum sanctions that the court determines accomplish those

---

[2] The trial court ordered McCoy's sentences for Counts One and Five to run consecutively to each other. (Doc. No. 113). However, for the purpose of this appeal, McCoy does not challenge the consecutive nature of his sentences. (*See* Appellant's Brief at 16-18). Accordingly, we will not discuss the trial court's findings relating to the consecutive nature of the offenses.

purposes without imposing an unnecessary burden on state and local government resources." R.C. 2929.11(A). To achieve the overriding purposes of felony sentencing, R.C. 2929.11 directs courts to "consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both." *Id.* In addition, R.C. 2929.11(B) instructs that a sentence imposed for a felony "shall be reasonably calculated to achieve the three overriding purposes of felony sentencing * * *, commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar crimes committed by similar offenders." "In accordance with these principles, the trial court must consider the factors set forth in R.C. 2929.12(B)-(E) relating to the seriousness of the offender's conduct and the likelihood of the offender's recidivism." *Smith* at ¶ 10, citing R.C. 2929.12(A). "'A sentencing court has broad discretion to determine the relative weight to assign the sentencing factors in R.C. 2929.12.'" *Id.* at ¶ 15, quoting *State v. Brimacombe*, 195 Ohio App.3d 524, 2011-Ohio-5032, ¶ 18 (6th Dist.), citing *State v. Arnett*, 88 Ohio St.3d 208, 215 (2000).

{¶95} From the record, it is clear that the trial court sentenced Jackson after considering the overriding purposes of felony sentencing set forth in R.C. 2929.11(A) and the relevant R.C. 2929.12(B)-(E) factors. First, at the sentencing

hearing, the trial court noted that it had "considered the general factors required by the Ohio Revised Code[,] * * * the specific facts of this case and the defendant's circumstances." (July 10, 2018 Tr. at 12-13). Furthermore, in its judgment entry of sentence, the trial court stated that it "considered the record, oral statements, and any victim impact statements, as well as the principles and purposes of sentencing under R.C. 2929.11, and the appropriate factors under R.C. 2929.12." (Doc. No. 113). Nevertheless, McCoy argues that the trial court erred by not specifically identifying the factors under R.C. 2929.12 that it weighed in determining his sentence. However, "[a] trial court's statement that it considered the required statutory factors, without more, is sufficient to fulfill its obligations under the sentencing statutes." *Maggette* at ¶ 32, citing *State v. Abrams*, 8th Dist. Cuyahoga No. 103786, 2016-Ohio-4570, ¶ 14, citing *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, ¶ 18. *See also State v. Dayton*, 3d Dist. Union No. 14-16-05, 2016-Ohio-7178, ¶ 21. Therefore, the record establishes that the trial court fulfilled its obligation to consider R.C. 2929.11 and 2929.12 when it sentenced McCoy.

{¶96} Moreover, the record supports the trial court's sentence. The record indicates that the victim was five-years-old, and thus, her young age exacerbated her injuries. *See* R.C. 2929.12(B)(1). Additionally, the record indicates that J.G. appeared withdrawn, shocked, and traumatized and was unable to speak to multiple people, including the medical and law enforcement personnel who tried to question

her. *See* R.C. 2929.12(B)(2). Also, the record reveals that the victim was McCoy's niece who had been entrusted to his care at the time of the offense. Accordingly McCoy was in a position of trust with the victim and the relationship facilitated the offense. *See* R.C. 2929.12(B)(6). Furthermore, at the time of the offenses, McCoy was under post-release supervision out of Michigan. (PSI at 1). *See* R.C. 2929.12(D)(1).

{¶97} Nevertheless, McCoy contends that several mitigating factors applied here and that the trial court erred by failing to identify and specifically assign weight to those mitigating factors. However, as previously discussed, the trial court explicitly stated that it had considered the relevant statutory factors and had, therefore, fulfilled its obligation under the sentencing statute. *See Maggette*, 2016-Ohio-5554, at ¶ 32; *Dayton*, 2016-Ohio-7178, at ¶ 21. To the extent that McCoy is arguing that the trial court did not assign the appropriate weight to the applicable mitigating and aggravating factors, we likewise do not find his argument persuasive. Ultimately, the trial court had broad discretion to determine the relative weight to assign the R.C. 2929.12 factors, and based on this record, we cannot find any fault in the trial court's decision to afford greater weight to the aggravating factors than to the mitigating factors.

{¶98} In conclusion, the trial court properly considered the purposes and principles of felony sentencing and applied the relevant R.C. 2929.12 factors.

Furthermore, McCoy's sentence is within the statutory range. Accordingly, there is not clear and convincing evidence that McCoy's sentence is unsupported by the record or that his sentence is otherwise contrary to law. *See Nienberg*, 2017-Ohio-2920, at ¶ 23. *See also Dayton*, 2016-Ohio-7178, at ¶ 24.

**{¶99}** Accordingly, McCoy's fourth assignment of error is overruled.

**{¶100}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**